## Lawrence v. General Medicine Associates

*Arthur H. James,* for plaintiff.
*Fredric L. Goldfein,* for defendant.

AVELLINO, *J.,* June 25, 1991—Georgia Lawrence is the administratrix of the estate of her husband. She began her journey to the Superior Court in June 1988, when she filed this lawsuit against several physicians, contending that they were negligent while caring for her husband during his lifetime. During the pendency of her action, she became embroiled in a discovery controversy that required several decisions (or orders) from me.

She now appeals (as a matter of right) from my last discovery order which imposed a severe sanction that took the form of a judgment of non pros and, hence, literally put her "out of court."[1] Because she lodged her appeal within 30 days of the date that my order was entered, her appeal is "timely." Consequently, it is probably fair to say that Mrs. Lawrence has managed to avoid the "usual" missteps on the sometimes treacherous journey from a trial court to an appellate court.[2] She

_____

1. Stated differently, Mrs. Lawrence has appealed from a "classically" final order. On classically final orders, see, e.g., Pines, *Pennsylvania Appellate Practice: Procedural Requirements and the Vagaries of Jurisdiction,* 91 Dick. L. Rev. 55, 78-88 (1986) (also explaining that the final order doctrine embodies a prudential (or political) judgment by rule-makers respecting the proper allocation of limited judicial resources).

2. On the confusing doctrine that continues to be used to determine access to intermediate appellate courts, *see, e.g., Pines, supra* note 1. *See also Lawrysh v. United Van lines,* 21 Phila. Rep. 553 (1991), appeal pending (contending that discovery orders are no longer subject to the "vagaries" of doctrines like "constructive finality," "collateral order," and so on).

has arrived, so to speak, before the Superior Court, ostensibly for the purpose of obtaining an appellate review of one or more of the many decisions that I made in her case. Nevertheless, and for the reasons which I will explain momentarily, I think that the Superior Court is required to *deny* Mrs. Lawrence an appellate review of *any* of my decisions.

The record I am transmitting (along with this memorandum) will disclose the following material (or pertinent) facts. Shortly after this lawsuit was started, the defendants served "standard" medical malpractice interrogatories (and document requests) upon Mrs. Lawrence's lawyer.[3] He (or Mrs. Lawrence) *never* answered this discovery. Hence, on January 6, 1989, the defendants presented a routine and "uncontested" motion designed to compel Mrs. Lawrence to comply with her discovery responsibilities. By "uncontested" I mean that Mrs. Lawrence (or her lawyer) never bothered to present a written response to the defendants' motion, nor did either of them appear in court to respond to it orally on the day that it was presented.[4] After reviewing the defendants' motion,[5] I signed a (hopelessly) routine

3. On "standard" medical malpractice interrogatories (and document requests), *see* S. Arbittier and D. Simon, *Civil Practice Manual* §6-3.2 and Forms 40A, 40B, 40C (6th ed. 1989 & Supp. 1990).

4. On the rules governing discovery motion processing in the Philadelphia Court of Common Pleas, see Phila. Civ. R. *206.2 (codifying the practice under former Ct. Reg. 87-3 which, in turn, codified existing custom and practice in Allegheny County). For a broader discussion of discovery motion processing that includes some practical "tips" for lawyers, *see, e.g.,* Thompson, *How to Cross the Drawbridge to Discovery Court: A few place secrets,* 21 Phila. XXXV (1991).

5. The defendant's motion was patterned after a form recommended by the bar association's discovery subcommittee. For the recommended form, *see* S. Arbittier & D. Simon, *supra* note 3, at 463 (Form 46-1A).

order directing Mrs. Lawrence to answer the defendants' discovery within 20 days.[6]

Mrs. Lawrence *ignored* this order.[7] Consequently, on April 7, 1989, (or about three months later) the defendants presented a *second* motion for sanctions pursuant to Rule 4019. After reviewing this motion, I signed a more or less routine order imposing a modest (or interim) sanction.[8] My order of April 7 consisted of three parts:

"(1) Plaintiff shall pay a counsel fee of $150 for the preparation and filing of this motion;

"(2) Plaintiff is cautioned that her continued and unexplained failure to comply with our order of January 6, 1989, may occasion even harsher sanctions; and

"(3) Defendant is directed to refrain from seeking further sanctions for 30 days." (emphasis supplied)

This sanction motion was also uncontested, *i.e.,* once again Mrs. Lawrence (and/or her lawyer) never bothered to present a written response, and each declined the opportunity to appear in court to respond to it orally.

---

6. *See* Pa.R.Civ.P. 4019 (authorizing trial judges, upon motion, to order a person "or a party" to comply with her discovery responsibilities). *See also Griffin v. Tedesco,* 355 Pa. Super. 475 at 481-82, 513 A.2d 1020 at 1023-24 (1986) (instructing trial courts to issue at least *one* order "warning" a party to comply with her discovery responsibilities before issuing a second order imposing a "harsh" sanction).

7. *See* defendants' motion for sanctions dated April 7, 1989, paragraphs 1 and 2.

8. Although interim sanction orders are not required by the appellate decisions, *see, e.g., supra* note 6, I often use them in non-arbitration cases, largely because litigants using our court are required to wait 48-60 months in order to have their claims (or defenses) heard by a jury. Because of this inordinate delay, I usually can afford to give a litigant an "extra chance," so to speak, to avoid a harsh sanction for failing to comply with a discovery order.

More importantly, perhaps, Mrs. Lawrence opted to ignore the "warning" set forth in paragraph two of this order. Stated differently, she continued to ignore my *first* order which had directed her to respond to the defendant's discovery. Consequently, on July 10, 1989, (or about three months later) the defendants presented a *third* motion for sanctions, asking me, in substance, to dismiss Mrs. Lawrence's lawsuit. Once again, the defendants' motion for sanctions was uncontested, i.e., Mrs. Lawrence (and/or her lawyer) never bothered to present a written response to the motion, and neither of them bothered to appear in court to respond to it orally.

Because dismissal is a severe sanction, I reserve it for punishing discovery "felonies" as opposed to "misdemeanors." This aside, whether or not I choose a severe sanction as opposed to a harsh or modest one, I always conduct a discretionary exercise which is informed by numerous factors.[9] Without digressing needlessly into an academic discussion of these factors, nor how I "weigh and balance" them, I've probably said enough about the judicial role in sanctioning to make my point: Decision making (especially that of a discretionary nature) implicates a *process* that is heavily dependent upon litigant participation for its accuracy (or fairness).[10]

---

9. *See, e.g. Gonzales v. Procaccio Bros.,* 268 Pa. Super. 245, 407 A.2d 1338 (1979) (instructing trial judges to conduct a discretionary exercise before selecting a discovery sanction, and explaining that the object of these exercises is to choose a punishment that "fits the crime").

10. The need for accuracy or "fairness" in decision-making probably explains, at least in part, why the state and federal constitutions guarantee "some kind of hearing" for litigants involved in civil proceedings. *See, e.g.,* Leubsdorf, *Constitutional Civil Procedure,* 63 Tex. L. Rev. 579, 592-93 (1984) ("[T]he traditional goals of due process [include:] The

Because Mrs. Lawrence and her lawyer did not participate in this process, I never heard their "side of the story," so to speak, and I never heard "reasons" (legal or otherwise) why I should not impose the severe sanction suggested by the defendants. Nevertheless, I read the defendants' third motion. Moreover, I listened carefully to the arguments advanced by defendants' counsel. Persuaded that a severe sanction was justified, I signed the order from which this appeal was taken.[11]

I should add, perhaps, that Mrs. Lawrence (and/or her lawyer) never bothered to ask me to reconsider my last order between July 12, 1989, and August 12, 1989, i.e., during the 30-day period that I was still empowered to modify or, perhaps, vacate that order.[12] Moreover, after Mrs. Lawrence filed

tribunal must assess the facts and law *accurately,* or at least predictably, so that the expectations of people who rely on the law will not be frustrated.") (emphasis supplied) For an intriguing discussion of the due process hearing requirement, albeit in the context of administrative or executive action, *see* Friendly, *"Some Kind of Hearing,"* 123 U.Pa.L. Rev. 1267 (1975) (critiquing American courts for using the constitution to impose the traditional (or judicial) adjudicatory model upon administrative agencies).

11. The order of July 10, 1989, like the others, was signed in open court. It states that the defendants' motion for sanctions is "granted," and directs that a judgment of non pros be entered against the plaintiff. Beneath my signature, I made the following contemporaneous (and handwritten) notation:

"The plaintiff seems to have no interest in pursuing this case. Counsel tells us that his opponent telephoned and explained that he wanted to oppose this motion, but might be a 'few minutes' late. As a result, and at the request of defense counsel, we held this matter until there were no other motions to be heard, i.e., we took it last. Nevertheless, no one appeared to answer."

12. The order I signed on July 10, 1989, was entered in the court's docket on July 12 (and was inexplicably re-entered on July 27). According to official court records, the prothonotary gave plaintiff's counsel written notice of my order pursuant to Rule 236 on July 12, which, of course, was the date on which

her appeal, I entered a "housekeeping" order directing her (or her lawyer) to supply me with a concise summary of the matters complained of on appeal.[13] Once again, Mrs. Lawrence (or her lawyer) chose to ignore my directive.

Since *every* fact I've just recited is a matter of record, I suggest that the Superior Court is required to *quash* this appeal on the (textbook) grounds that Mrs. Lawrence, who failed to respond (much less "object") to any of the defendant's motions, has *forfeited* her constitutional right to challenge any of the decisions which I made respecting those motions.[14]

The forfeiture (or waiver) rule was designed, at least in part, to prevent litigants from "sandbagging" trial judges by challenging their decisions with contentions advanced for the first time on appeal. The rule was announced initially in the historic case of *Dilliplaine v. Lehigh Valley Trust Company*,[15] and was subsequently enshrined in numerous statutes[16] and, of course, in Pa.R.A.P.

---

the order was first recorded.

13. Pa.R.A.P. 1925(b) provides in pertinent part: "The lower court . . . may enter an order directing the appellant to file of record . . . . and serve on the trial judge a concise statement of the matters complained of on the appeal no later than 14 days after entry of such order. A failure to comply with such direction may be considered by the appellate court as a waiver of all objections to the order, ruling or other matter complained of."

14. *See, e.g.,* R. Darlington, K. McKeon, D. Schuckers and K. Brown, *Pennsylvania Appellate Practice,* §§ 302.4, 302.19 (1986). ("As a general matter, failure of a party to appear in a proceeding below constitutes a waiver of all issues on appeal.")

15. 457 Pa. 255, 322 A.2d 114 (1974).

16. For legislative replications of Pa.R.A.P. 302(A), *see, e.g.,* 2 Pa. Cons. Stat. §703 & §753 (barring persons appealing from the determinations of state and local agencies from raising issues for judicial review that were not raised before the agency).

302(A). Because so much ink has been spilled by other courts,[17] and national commentators,[18] discussing—and almost always praising—this (prudential) procedural doctrine,[19] I won't waste any of mine here. Instead, I'll offer a brief comment: I can't imagine a rule any *plainer* than appellate rule 302(A): *"Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."* (emphasis supplied) More importantly, I

17. For a fairly recent collection (and discussion) of the *Dilliplaine* progeny, *see, e.g.,* Comment. *The Demise of the Doctrine or Basic and Fundamental Error in Pennsylvania and The New Role of Strict Issue Preservation,* 24 Dug. L. Rev. 395 (1985).

18. *See, e.g.,* Martinique, *Considering New Issues on Appeal: The General Rule and the Gorilla Rule,* 40 Vand. L. Rev. 1023, 1054, 1058 (1987) (praising Pennsylvania for being the *first* American jurisdiction with the good sense to exterminate the ubiquitous pest that Professor Martinique has dubbed, "the gorilla rule of appellate review"). Professor Martinique is one of America's foremost authorities on appellate court jurisdiction, and his writings are often cited by our appellate courts.

19. The forfeiture rule is one of many rules in a complex matrix of "door-opening" and "door-closing" rules that are typically collected under the heading of "subject matter jurisdiction." Although the court access rules laid down for intermediate appellate courts are "transubstantive" respecting litigant rights, they are value-laden in the sense that they embody political (or prudential) judgments about the allocation of judicial resources. *See, e.g.,* Pines, *supra* note 1, at 80 (mentioning the resource-allocation justification for the final order doctrine). *See also Lawrysh,* 21 Phila. Rep. at 553-54 n.1 (1991) (explaining that the Pennsylvania Supreme Court sometimes lays down court access rules in its case decisions as opposed to promulgating them using its regular rule-making channels). The political nature of court access rules is emphasized, nicely I think, by a (familiar) companion doctrine which requires intermediate appellate courts to raise "subject matter jurisdiction" questions on a *sua sponte* basis.

can't imagine a *plainer* case for the application of Rule 302(A) than the case *sub judice.*

For these reasons, I suggest that the Superior Court is required to quash this appeal, as opposed to conducting an appellate review of any of the decisions which I made on the defendants' three motions.[20]

20. Judging from the hopelessly indifferent conduct exhibited by the appellant throughout these proceedings, this appeal may have been lodged for dilatory or spiteful reasons. In any event, and considering the clarity of Rule 1302(a), chances are good that it was lodged by a lawyer who forgot to do his (legal) homework. Hence, I reiterate the suggestion which I made in *Lawrysh*, 21 Phila. Rep. at 555-58 & nos. 8-14 (1991), appeal pending, namely, that the Superior Court should use its "new" sanction authority to order the appellant (and/or her *lawyer)* to reimburse our court for the expense of supplying her with needless (or extravagant) processing. For an additional comment on the subject of extravagant processing, *see, e.g., Friendly, supra* note 10, at 1276:

"It should be realized that procedural requirements entail the expenditure of limited resources, that at some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection, and that the expense of protecting those likely to be found undeserving will probably come out of the pockets of the deserving." (footnote omitted)